IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BIOQUELL, INC.,

    Plaintiff,

    v.

STEVEN FEINSTEIN, ET AL.,

    Defendants.

:
:
: FILED
:
: FEB 16 2011
:
: MICHAEL E. KUNZ, Clerk
: By_____ Dep. Clerk
:
:
:
:

CIVIL ACTION

NO. 10-2205

## MEMORANDUM OPINION

Tucker, J.                                                                                                                                                  February __, 2011

Presently before the Court is Plaintiff's Motion for a Preliminary Injunction (Doc. 3) and Defendants' Response in Opposition thereto (Docs. 16-17). For the reasons set forth below and upon consideration of the parties' submissions and oral argument held before this Court on December 15, 2010, this Court will deny Plaintiff's Motion for a Preliminary Injunction.

I.                         **PROCEDURAL BACKGROUND**

This case arises out of allegations of the breach of a restrictive covenant by former employees. The restrictive covenant is in the form of a non-compete provision and a confidentiality provision in an employment agreement ("the Employment Agreement") entered into between Plaintiff Bioquell, Inc. ("Plaintiff"), as employer, and Defendants, Steven Feinstein ("Defendant Feinstein") and Robert Buscher ("Defendant Buscher"), as employees. Plaintiff alleges that Defendants Feinstein and Buscher breached the restrictive covenant and misappropriated Bioquell's trade secrets when they subsequently were employed by Defendant SixLog Corporation ("Defendant SixLog"). Plaintiff has filed a Motion for Temporary Restraining Order and Preliminary Injunction

(Doc. 3), seeking an order from the Court preliminarily, permanently, and temporarily enjoining Defendants from committing the alleged violations, and awarding compensatory and consequential damages in an amount in excess of $75,000.00, plus costs, punitive damages, and attorneys' fees.

On June 24, 2010, the Court granted as unopposed Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 12.) Plaintiff filed that motion on May 21, 2010. Defendants did not file a response in opposition thereto. Instead, on June 10, 2010, Defendants filed a Motion to Partially Dismiss the Complaint. (Docs. 10-11.) In the June 24, 2010 Order, the Court reserved judgment on Defendants' motion until the end of the response period provided under Local Civil Rule 7.1(c). With respect to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, the Court found that Defendants had ample time to respond, and their failure to do so permitted the Court to grant Plaintiff's motion as uncontested.

On June 28, 2010, Defendants filed an Emergency Motion for Reconsideration of the June 24, 2010 Order and Leave to File Response Out of Time. (Doc. 13.) On July 2, 2010, the parties stipulated to vacate the Court's June 24, 2010 Order to allow Defendants to file a response to Plaintiff's Motion for Preliminary Injunction on or before July 9, 2010. Defendant filed the response on July 9, 2010. On June 10, 2010 Defendants collectively filed a Motion to Partially Dismiss the Complaint pursuant to Fed. R. Civ. P. 12 (b)(6) for failure to state a claim upon which relief can be granted. Thereafter, on September 22, 2010 Defendants filed a Motion for Partial Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12 (c). In an Order entered on November 23, 2010, the Court granted Defendant's Motion to Partially Dismiss Plaintiff's Complaint and denied Defendant's Motion For Judgment on the Pleadings. The Court's November 23, 2010 Order dismissed ten of Plaintiff's thirteen claims with the following claims remaining: as against Defendant Feinstein, one count of intentional misrepresentation and one count of breach of contract and as

against Defendant Buscher, one count of breach of contract. Subsequently, on December 15, 2010, the Court held oral argument on Plaintiff's Motion For Preliminary Injunction.

The facts relevant to the instant motion are summarized below.

## II.            FACTUAL BACKGROUND

Plaintiff is in the business of providing hydrogen peroxide decontamination equipment and services to the healthcare, life sciences, food production, and defense sectors. (Compl. ¶ 8.) Mike Herd, Bioquell's Vice President, testified during the hearing that Plaintiff's process takes roughly twenty-four hours to decontaminate a building and as short as fifteen minutes for a room. Plaintiff hired Defendant Feinstein to serve as the Western Regional Sales Manager out of his home located in Arizona. Defendant Feinstein's employment with Plaintiff commenced on October 1, 2008. (Compl. ¶ 9.) Defendant Feinstein was not responsible for dealing with Healthcare clients. In addition, Plaintiff hired Defendant Buscher, with employment commencing on December 1, 2008, to serve as the Vice-President of Operations of Bioquell Inc. (Compl. ¶ 10.) During their employment with Bioquell, Defendants Feinstein and Buscher had access to Plaintiff's confidential and proprietary information . As a condition of their employment, both Defendants Feinstein and Buscher were required to sign an Employment Agreement, which contained confidentiality and non-compete provisions. (Compl. ¶ 11.)

> The Employment Agreement contains the following non-compete provisions:
>
> You undertake and covenant to us that in order to protect BIOQUELL's legitimate business interests, for a period of two years from the date you cease to be an employee of BIOQUELL Inc. you will not in North America work for or be employed by or receive directly or indirectly any remuneration or consultancy fee or equity participation from: (i) other manufacturers of hydrogen peroxide vapor generators; (ii) companies or organisations selling hydrogen peroxide vapor generators; (iii) companies or organisations selling the servicing of hydrogen peroxide vapor generators; or (iv) companies or organisations selling a bio-decontamination service whether for buildings

3

or rooms or equipment.

(Doc. 11, Exs. A & B.) In addition, the Employment Agreement contains the following confidentiality provision:

> You agree and acknowledge that you will have access to information which has significant value to the Company. This information includes, but is not limited to, customer information, proprietary BIOQUELL Group Information, product and technology know-how, trade secrets, business methods and details (including pricing and margin) and elements of the BIOQUELL Group's and the Company's strategy (together "Confidential Information"). You confirm and undertake to us that, in addition to your common law and/or statutory obligations, during or after your employment ceases with the Company you will not divulge any Confidential Information in whole in part directly or indirectly to third parties, whether to competitors of the Company or others.

(Doc. 11, Exs. A & B.) Furthermore, in the event of breach, the Employment Agreement provides, "BIOQUELL shall be entitled to the remedies of injunction, specific performance and other equitable relief for any threatened, anticipatory or actual breach of this Agreement," and further provides that Defendants "agree in advance to the granting of injunctive relief in BIOQUELL's favour without proof of actual damage." (Doc. 11, Exs. A & B.) Plaintiff avers that during their employment Defendants became familiar with Bioquell Inc.'s proprietary information, including customer information, proprietary group information, product and technology know-how, trade secrets and other information.

In August 2009, Defendant Feinstein resigned from his position, contending that Plaintiff misrepresented the terms of compensation in its offer of employment, and stating his intent to contract for employment with Astro Pak Corporation ("Astro Pak"). (Compl. ¶ 16.) Subsequently, Mike Herd sent Defendant Feinstein correspondence reminding him of the confidentiality requirements under the Employment Agreement. On August 28, 2009, Plaintiff and Defendant Feinstein entered into a Release of Claims Agreement ("the Release"), wherein Defendant Feinstein

agreed to release Plaintiff from any claims relating to the alleged misrepresentation. (Compl. ¶ 17.) Additionally, Plaintiff agreed to release Defendant Feinstein from the non-compete provision as to Defendant's prospective employment with Astro Pak. (Compl. ¶ 18.) The Release of Claims Agreement provides that, "FEINSTEIN understand[s] and agrees that the Non-compete shall remain in full force and effect with regards to any other employer or third party pursuant to the terms of such Non-compete." (Compl. ¶ 19.) Plaintiff claims that, prior to entering into the Release, Defendant Feinstein represented to Plaintiff that Astro Pak was not a competitor. (Compl. ¶ 20.) In an email to Plaintiff's Vice-President (Mike Herd), Defendant Feinstein stated, "As you know, we have never run in to Astro Pak on any project. They concentrate their business on the on-site passivisation and parts cleaning (in their cleanrooms)." (Compl. ¶ 21.) Plaintiff claims that it relied on that misrepresentation to its detriment when it entered into the Release.

After Defendant Feinstein commenced employment with Astro Pak, Astro Pak formed SixLog Corporation to provide rapid on-site biological decontamination services utilizing proprietary ionized hydrogen peroxide technology. (Compl. ¶ 22.) For all intents and purposes SixLog is a subsidiary S corporation to Astro Pak. During the December 15, 2010 hearing, Ken Verheyen, President of Astro Pak and SixLog, testified that since its incorporation, SixLog has amassed twelve customers and netted eighty nine thousand dollars in revenue. Defendant Feinstein was hired to serve as the Director of Technology for SixLog. (Compl. ¶ 23.) Mike Herd testified that he saw a press release noting Defendant Feinstein's new position, he avers that the release made no mention of employment by Astro Pack at all. Plaintiff alleges that SixLog's business is in direct competition with that of Bioquell. (Compl. ¶ 24.) According to Mike Herd, SixLog's web page advertises the company as serving the same industries as those served by Bioquell. Moreover, Plaintiff learned that Defendants were attending the same trade shows that Bioquell attended, in addition using similar

5

training materials.

On October 23, 2009, after Defendant Feinstein began working for SixLog, Plaintiff terminated Defendant Buscher's employment as a result of unsatisfactory job performance. (Compl. ¶ 26.) Thereafter, Defendant Buscher began employment at SixLog. Defendant Buscher was not released from either the confidentiality provision or the non-compete provision of the Employment Agreement. (Compl. ¶ 27.) Plaintiff believes that Defendant Feinstein was substantially involved in Defendant Buscher's employment at SixLog. (Compl. ¶ 29.) Plaintiff also believes that Defendants Feinstein and Buscher have conspired in misappropriating trade secrets learned during their respective employments with Plaintiff, have tortiously interfered with Plaintiff's business relations, and have acted in concert with Defendant SixLog in doing so. (Compl. ¶ 30.) Consequently, Plaintiff sent correspondence to Defendants Feinstein and Buscher requesting that they cease and desist their respective employments with SixLog, but neither responded. (Compl. ¶¶ 30-31.) Defendant Buscher was since terminated for performance reasons on June 30, 2010, and is no longer employed by SixLog.

Despite alleging that SixLog had contact with a few of its customers, Plaintiff conceded that it could not name a single Bioquell customer that was taken by SixLog. Moreover, Plaintiff did not dispute that Defendant SixLog's decontamination process differs from Bioquell's in that it involves ionization unlike Bioquell's which is based on hydrogen peroxide that is vaporized. Additionally, also unlike Bioquell, SixLog concentrates its business on passivation and parts cleaning. Mike Herd testified that Bioquell did not compete with Astro Pak on parts cleaning. In fact, Mike Herd agreed that nothing in Plaintiff's employment agreement would prevent Defendant Feinstein from working for Astro Pak in any department, including a bio-decontamination department.

During the December 2010 hearing, Defendant Feinstein testified that he is paid by Astro Pak and receives all his benefits including his 401K from Astro Pak. In response to questions posed by counsel, Defendant Feinstein states that he left Bioquell for monetary reasons. Specifically, Defendant Feinstein testified that he accepted the position at Bioquell for one hundred thousand dollars which was lower than what he hoped for but was advised that his bonus would compensate for the lower salary. Defendant Feinstein ultimately received stock options to make up for the bonuses. In his position as Director of Technology, Defendant Feinstein does not have any sales responsibility. In fact, the extent of his communication with customers concentrates on technical support. Ken Verheyen testified that Feinstein supports a ten person sales team by providing information about the technical aspects of the job. When questioned about his knowledge of SixLog's incorporation, Defendant Feinstein testified that he knew very little of Astro Pak expanding into hydrogen peroxide decontamination services. Defendant Feinstein claims that he was intentionally kept in the dark. Ken Veryehn testified that very limited information about Astro Pak's expansion was given to candidates interviewing for Feinstein's position so as to avoid having the information leaked into the market place before it became public.

Based on the foregoing, Plaintiff brings the following claims for relief: (1) intentional misrepresentation claim against Defendant Feinstein; (2) breach of contract claim against Defendant Feinstein for violation of the non-compete provision and (3)breach of contract claim against Defendant Buscher for violation of non-compete provision. In addition to monetary damages, Plaintiff seeks an order from the Court preliminarily and permanently, enjoining the alleged violations as follows:

1. Defendant Feinstein and/or Defendant Buscher are enjoined from working for or consulting with Defendant SixLog, directly or indirectly, or otherwise violating the Employment Agreement for a period of two (2) years;

2. Defendant SixLog is enjoined from employment or consulting with Defendant Feinstein and/or Defendant Buscher, directly or indirectly, for a period of two (2) years;

3. Defendant Feinstein and/or Defendant Buscher are enjoined from participating in any business activities competitive with Plaintiff for a period of two (2) years;

4. Defendant Feinstein and/or Defendant Buscher are enjoined from directly or indirectly engaging in any business, trade, or occupation similar to or in competition with Plaintiff in North America for a period of two (2) years;

5. Defendant Feinstein and/or Defendant Buscher are enjoined immediately and at any time hereafter from possessing, using, and/or disclosing confidential and proprietary information and documents belonging to Plaintiff; and

6. Defendant Feinstein and/or Defendant Buscher are directed to immediately return to Plaintiff all confidential and proprietary information and documents acquired by Defendant Feinstein and/or Buscher from Plaintiff during their respective employments with Plaintiff.

(Doc. 3.)

The bulk of Plaintiff's claims were dismissed pursuant to Fed. R. Civ. P. 12 (b)(6) after the filing of Plaintiff's Motion for Preliminary Injunction. As a result, many of the arguments Plaintiff advances in support of the motion are moot. Additionally, Defendant Buscher's termination from SixLog also moots many of Plaintiff's arguments.

**III.**                            **LEGAL STANDARD**

"[T]he grant of injunctive relief is an 'extraordinary remedy which should be granted only in limited circumstances.'"AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994); see also Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988). Generally, in determining whether to grant a preliminary injunction or a temporary restraining order, courts in this Circuit review four factors: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the

preliminary injunction is issued; and (4) the public interest. Shire US, Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003) (citations omitted). "[W]hile the burden rests upon the moving party to make [the first] two requisite showings, the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.'" Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (citation omitted); see also Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. Pa. 2000) (noting that "[i]f relevant, the court should also examine the likelihood of irreparable harm to the nonmoving party and whether the injunction serves the public interest.") All four factors should favor relief before an injunction will be issued. S & R Corp. v. Jiffy Lube Int'l. Inc., 968 F.2d 371, 374, (3d Cir. 1992)(citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 192 (3d Cir. 1990)). When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is "particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980)."

In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" Acierno, 40 F.3d at 653 (quoting Instant Air Freight Co., 882 F.2d at 801). The word "irreparable connotes that which cannot be repaired, retrieved, put down again, atoned for." Id. (citations omitted). In addition, the claimed injury cannot merely be possible, speculative or remote. [M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury...'" Id. at 655 (citations omitted).

III.  DISCUSSION

The Court derives its authority to issue temporary restraining orders and preliminary injunctions from Rule 65 of the Federal Rules of Civil Procedure. In deciding whether to grant injunctive relief, the Court must consider whether: (1) Plaintiff has demonstrated the likelihood of success on the merits; (2) Plaintiff will be irreparably harmed by the denial of injunctive relief; (3) the balance of harms favors Plaintiff or if, instead, granting the relief would result in greater harm to Defendants; and (4) the public interest favors granting the injunction. See, e.g., Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004); ACLU of New Jersey v. Black Horse Pike Reg. Bd. of Ed., 84 F.3d 1471, 1477 (3d Cir. 1996). Injunctive relief is "an extraordinary remedy which should be granted only in limited circumstances." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1989)). Here, since Plaintiff has not shown irreparable harm, Plaintiff has failed to establish its entitlement to injunctive relief.

I.  **Likelihood of Success on the Merits**

The first factor of the preliminary injunction analysis is the likelihood of success on the merits. Here, Plaintiff present three claims: one count of intentional misrepresentation and two counts of breach of contract as it pertains to the non-competition provision of the Employment Agreement. Plaintiff argues that it is likely to succeed on the merits of its breach of contract claims because it is reasonably probable that Plaintiff will be able to show that the non-compete provision is valid and enforceable and that Defendants Feinstein and Buscher are in breach of their respective contractual agreements. (Pl.'s TRO Mot. 7-8.) In response, Defendants argue that Plaintiff is not likely to succeed on the merits because the geographic scope of the non-compete provision

(throughout North America) is unreasonable. (Defs.' Resp. 9-15.)

Plaintiff seeks to enjoin Defendants "from directly or indirectly engaging in any business, trade or occupation similar to or in competition with Plaintiff in North America for a period of two (2) years." (Pl.'s Proposed Order ¶ 4.) While courts typically disfavor non-compete provisions that are so geographically expansive, see Intermetro Indus. Corp v. Kent, No. 3:CV-07-0075, 2007 U.S. Dist. LEXIS 28239, at *18 (M.D. Pa. Apr. 17, 2007) (citing Nat'l Bus. Servs. v. Wright, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998)), courts have upheld covenants restricting competition nationwide or throughout the region of North America, where appropriate. See Graphic Mgmt. Assocs. v. Hatt, No. 97-CV-6961, 1998 U.S. Dist. LEXIS 3949, at *36-37 (E.D. Pa. Mar. 18, 1998); QVC, Inc. v. Bozek, 1996 U.S. Dist. LEXIS 4770, at *10 (E.D. Pa. Apr. 12, 1996) (upholding national scope of restrictive covenant); Kramer v. Robec, Inc., 824 F. Supp. 508, 512 (E.D. Pa. 1992) ("Since competition in the computer market is world-wide and since Robec distributes throughout the nation and overseas, the geographic extent of the covenant—the United States—is reasonable."). Here, Plaintiff argues that the territorial limitations are reasonable because Bioquell is an international business. In addition, Plaintiff argues it is not unreasonable to expect that Defendants, in their respective positions as Vice President of Operations and Western Regional Sales Manager, would have been privy to regional sales information and strategies and/or would have had contacts with customers throughout the region. The Court agrees.

Defendants argue, however, that since Astro Pak and SixLog are California corporations, California law governs the interpretation of the non-compete. California law disfavors non-competition provisions and states in relevant part that "every contract by which anyone is restrained from engaging in lawful profession, trade or business of any kind is to that extent void." Cal Bus & Prof Code § 16600. Thus, Defendants argue that California law voids the covenant not to compete

11

as it pertains to Defendant Feinstein's employment at SixLog. (Defs.' Resp. 17-18.)

As a threshold matter, Plaintiff is more likely to succeed in establishing the validity and enforceability of the non-compete provision if either Pennsylvania or Arizona law, rather than California law, is found to govern disputes under the Employment Agreement. The Employment Agreement is silent on the governing law, yet the Release expressly provides, "This Agreement shall be interpreted under the laws of the state of Arizona." (Doc. 3, Ex. C.) Under either Pennsylvania or Arizona law, Plaintiff is likely to succeed in showing that the non-compete is enforceable. Although restrictive covenants are disfavored in Pennsylvania and Arizona, they are enforceable in equity under certain circumstances. In Pennsylvania, restrictive covenants are enforceable where they are "incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." Victaulic Co. v. Tieman, 499 F.3d 227, 235 (3d Cir. 2007) (quoting Hess v. Gebhard & Co., 808 A.2d 912, 917 (Pa. 2002)); Nordetek Envtl., Inc. v. RDP Techs., Inc., 677 F. Supp. 2d 825, 839 (E.D. Pa. 2010). Pennsylvania courts consider a restrictive covenant to be "reasonably necessary for the protection of the employer" when it is tailored to protect an employer's legitimate interests. Victaulic, 499 F.3d at 235. The "legitimate business interests" of an employer include "trade secrets, confidential information, goodwill, unique or extraordinary skills, and specialized training." Zambelli Fireworks Manuf. Co., Inc. v. Wood, 592 F.3d 412, 424 (3d Cir. 2010). However, "[w]hen a covenant imposes restrictions broader than necessary to protect the employer, a court of equity may 'blue pencil' the agreement by granting enforcement that is limited to those portions of the restrictions which are reasonably necessary for the protection of the employer." PharMethod, Inc. v. Caserta, No. 10-1388, 2010 U.S. App. LEXIS 11237 (3d Cir. June 2, 2010).

12

Under Arizona law, "[t]he validity of a restrictive covenant is determined by its reasonableness." Highway Techs., Inc. v. Porter, No. CV-09-1305-PHX-DGC, 2009 U.S. Dist. LEXIS 57607, at *3-4 (D. Ariz. June 26, 2009) (citing Phoenix Orthopaedic Surgeons, Ltd. v. Peairs, 790 P.2d 752, 758 (Ariz. Ct. App. 1989)). Arizona courts consider a restrictive covenant to be "reasonable and therefore enforceable by injunction where (1) the restraint does not exceed that necessary to protect the employer's legitimate interests, (2) the restraint would not cause undue hardship to the employee, and (3) the restraint would not cause harm to the public interest." Id. (citations omitted); Compass Bank v. Hartley, 430 F. Supp. 2d 973, 978-981 (D. Ariz. 2006). Therefore, applying either Arizona or Pennsylvania law to the instant matter, Plaintiff has a reasonable chance of success on its argument that the non-compete is valid and enforceable.

## II.    Irreparable Harm to Plaintiff

The second factor in the preliminary injunction analysis is that of irreparable harm, which requires an imminent injury such that legal or equitable relief at the end of trial will not remedy the harm. Acierno, 40 F.3d at 653. Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 195(3d Cir. 1990) (quoting Morton v. Beyer, 822 F.2d 364, 372 (3d Cir. 1987)) Morever, the injury must be a presently existing threat, and not a remote or speculative possibility of future harm. Acierno, 40 F.3d at Id. at 655.

Although Plaintiff has a reasonable likelihood of success on the merits of its remaining claims, Plaintiff has not shown irreparable harm sufficient to warrant injunctive relief. Plaintiff claims that the disclosure of trade secrets by Defendant Feinstein through his alleged violation of the non-competition provision has the potential to enable or is enabling SixLog to gain a competitive

13

edge over Plaintiff, which is not quantifiable in monetary terms, and which would have a significant impact on Plaintiff's market share. (Pl.'s TRO Mot. 8.) In response, Defendants argue that Bioquell has not shown immediate and irreparable harm sufficient to warrant injunctive relief. (Def.'s Resp. 15-17.) Specifically, Defendants contend that the threat of Defendant Feinstein's potential disclosure of trade secrets to Defendant SixLog does not constitute irreparable harm, there are fundamental differences between the services provided by Bioquell and SixLog, any technical information acquired by Defendant Feinstein at Bioquell is irrelevant to his current position, and Defendants have not interfered with Bioquell's contractual relations with its customers. (Def.'s Resp. 15-16.) In fact, during the hearing, Herd testified that he could not name one Bioquell customer which was taken by SixLog. Moreover, Herd also testified that he was unaware of any technology that Feinstein had disclosed to anyone.

Also, cutting against the grant of injunctive relief is the fact that Defendant Buscher is no longer employed by SixLog. SixLog's termination of Defendant Buscher's employment negates the likelihood that Plaintiff will suffer any irreparable harm as a result of Defendant Buscher's employment with SixLog. "[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future; the moving party must make a clear showing of immediate irreparable harm." Berman v. Lamer, 874 F. Supp. 102, 106 (E.D. Pa. 1995) (citing Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989). Here, Plaintiff fails to demonstrate that it will be irreparable harmed absent an injunction enjoining Defendants Feinstein and Buscher from working for or consulting with SixLog, directly or indirectly, or otherwise violating the Employment Agreement.

### III. Risk of Harm to Defendants

A failure to establish all four elements of a claim for injunctive relief is fatal to the claim.

See S&R Corp. v. Jiffy Lube, Int'l, Inc., 968 F.2d 371, 374 (3d Cir. 1992) (citing Hoxworth v. Blinder Robinson & Co., 903 F.2d 186, 197-98 (3d Cir. 1990)). Nevertheless, the Court will address briefly the remaining elements. Absent a showing by Plaintiff of immediate and irreparable harm, the balance of harms does not tip in Plaintiff's favor. It is reasonably likely that Plaintiff would suffer irreparable harm if Defendant Feinstein disclosed Bioquell's trade secrets. However, Defendants have submitted affidavits certifying that they have not misappropriated Bioquell's trade secrets. Therefore, it appears that the gravest threat to Plaintiff arising from Defendant Feinstein's employment with Defendant SixLog has been appropriately addressed. Consequently, absent any showing that there is a tangible threat that Defendant Feinstein has or will disclose Bioquell's trade secrets, the harm to Defendant Feinstein resulting from his inability to work for SixLog or any other competitors for up to two years and the harm to SixLog resulting from its inability to benefit from the services of Defendant Feinstein for up to two years outweigh the harm to Plaintiff resulting from Defendant Feinstein's employment at SixLog.

## IV.  Public Interest

The final prong in the preliminary injunction analysis is a consideration of the public interest. Opticians, 920 F.2d at 197. Plaintiff argues that the public interest favors the inviolability of trade secrets and the enforcement of confidentiality agreements and non-compete agreements. As this is in essence a breach of contract dispute, the public interest favors enforcing valid contracts and making parties live up to their agreements. See Siemens Building Technologies, Inc. v. Camacho, No. 01-1613, 2001 WL 395294, *2 (E.D. Pa. Apr. 18, 2001) (noting that it is in the public interest to enforce valid contracts and protect legitimate business interests). The Court agrees that there is a strong public interest in upholding the non-compete agreement to the extent reasonably necessary to safeguard Plaintiff's legitimate proprietary interests. Since, however, Plaintiff has failed to make the

15

necessary showing of irreparable harm to support its claim for injunctive relief, this Court is not authorized to grant the extraordinary remedy of a temporary restraining order.

IV.                                                **CONCLUSION**

Accordingly, having considered each of the four factors and finding that Plaintiff has failed to make a showing of irreparable harm, the Court will deny Plaintiff's motion for injunctive relief.

An appropriate order follows.

                                               **BY THE COURT:**

                                               */s/ Petrese B. Tucker*

                                               **Hon. Petrese B. Tucker, U.S.D.J.**